UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DAVID MISTACHKIN,

                                Plaintiff,

        v.

DYLAN SPENCER ET AL,

                                Defendants.

Case No. 3:25-cv-05902-TLF

ORDER ON CROSS MOTIONS
FOR SUMMARY JUDGMENT

The Court has considered the briefs, documents submitted with the briefs, the audiovisual evidence, and the balance of the record. For the reasons discussed below, defendant's motion is granted, and plaintiff's motion for partial summary judgment is denied. Qualified immunity applies to all defendants because Mr. Mistachkin's Fourth Amendment rights were not violated.

## **AUDIOVISUAL EVIDENCE**

Plaintiff placed videos into evidence of the body camera footage ("bodycam footage") from Deputy Dylan Spencer and Deputy Jeff Barbo. Dkt. 35, Declaration of Joseph Shaeffer ("Shaeffer Decl."), Ex. 2, 3, 9. Plaintiff has submitted a transcript; this might be an aid to the jury but would not itself be evidence. *Id*. at Ex. 3; *see United States v. Franco,* 136 F.3d 622, 626 (9th Cir. 1998) ("When tapes are in English, they normally constitute the actual evidence and transcripts are used only as aids to understanding the tapes; the jury is instructed that if the tape and transcript vary, the

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 1

tape is controlling.") (citing *United States v. Turner,* 528 F.2d 143, 167-68 (9th Cir. 1975), cert. denied, 429 U.S. 837 (1976)); Ninth Circuit Civil Model Jury Instruction 2.6 (advising the jury "bear in mind that the recording is the evidence, not the transcript. If you [hear] something different from what [appears] in the transcript, what you heard is controlling.").

Defendants have also attached the audiovisual evidence to their declarations and incorporated them by reference. Dkt. 24, 25, 26, 27, 31.

Deputy Spencer has adopted the statements he made in his report dated February 12, 2024, at 21:37:57, in Case No. 24-002882. Dkt. 26, Declaration of Deputy Dylan Spencer ("Spencer Decl.") at 2, Ex. 1 at 6-9. On that date, at approximately 21:37 hours, he was driving a patrol car in an area known as Wynooche Valley Road. *Id*. at 8. The speed limit on Wynooche Valley Road is 40 miles per hour. *Id.* In a pullout on the westbound side of the road, Deputy Spencer noticed (as he was driving by) a red truck with lights off, sitting in the pullout. *Id*. He drove past the truck one time, then returned to the truck "to contact any occupants inside." *Id.* He parked the patrol car behind the truck; the lights of the patrol car were off. *Id.*

Deputy Spencer states that he did not block the red truck in, and the truck would have "had an avenue of escape if it wanted to leave." *Id.*

Deputy Spencer was later joined by Deputy Barbo. *Id.* at 8.

Deputy Barbo has adopted the statements he made in his report dated February 12, 2024, in Case No. 24-002882. Dkt. 27, Declaration of Deputy Jeff Barbo ("Barbo Decl.") at 2, Ex.1 at 5. Deputy Barbo received a call from Spencer "a few moments after" 21:38 hours on February 12, 2024. *Id.* Deputy Sheriff Jeff Barbo worked for the

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 2

Grays Harbor Sheriff's Office on February 12 and 13, 2024. Dkt. 27, Barbo Decl. at 2-3; Dkt. 44, Supplemental Declaration of Deputy Jeff Barbo ("Barbo Supp. Decl.") at 2-4. Plaintiff placed the Barbo video into evidence, along with a transcript of the bodycam footage from Deputy Barbo. Dkt. 35, Shaeffer Decl. at 1-2, Ex. 4, 5. The Court has not reviewed the transcripts, because they are not evidence. *Id*. at 1-2, Ex. 3, 5; Ninth Circuit Civil Model Jury Instruction 2.6.

- Audiovisual evidence from bodycam of Deputy Spencer

The recording of the first bodycam video taken by Deputy Spencer's bodycam shows a dark evening, a red pickup truck covered with spots of water, and what appears to be steady rain; Deputy Spencer got out of his patrol car and approached the driver's side window of the red pickup. Dkt. 35, Shaeffer Decl. at 1, Ex. 2, at time stamp 21:38:19-28. Spencer shined a light into the driver's side window. *Id.* Spencer greeted the driver, told the driver his name and title, and stated, "it's just an odd spot for someone to be parking so I was just checking to make sure everything was okay." *Id.* at 21:38:36. The driver said, "I'm totally fine, I'm just headed home, I just live right down the street here." *Id.* at 21:38:40. Spencer asked the driver where he lived, and the driver responded with an address; Spencer then asked, "do you have your driver's license on you?" *Id.* at 21:38:47.

Deputy Spencer asked the driver if there is any reason he is pulled over there. *Id.* at 21:38:50. The driver appears to be holding his driver's license in his hand, and he told Spencer that he's taking a time out, and figured it was safe to pull over there. *Id.* at 21:38:57. The driver explained, "I'm just taking a moment, for myself." *Id.* at 21:39:00. The driver stated, "everything's fine," and Deputy Spencer responded, "I'll be back in

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 3

just a second, okay?" and turned away from the driver to walk toward the patrol car. It is unclear from the video whether Deputy Spencer has the driver's license with him, but in the audio, Deputy Spencer contacted another person and asked about Judge Mistachkin's first name. The person responded, and Spencer repeated, David Leonard Mistachkin and tells them there's not too many people by that name; Spencer asks the person "are you able to come out to where I am?" *Id.* at 21:39:49. Deputy Spencer stated that the driver is Judge Mistachkin, he is pulled over on the side of the road, said he's taking a time out, and "his eyes look blood shot watery." Dkt. 35, Shaeffer Decl. at 1, Ex. 2 at 21:39:57.

Deputy Spencer made another call. Then Spencer walked back to the driver's side window of the pickup. Dkt. 35, Shaeffer Decl. at 1, Ex. 2 at time stamp 21:41:35–38. Spencer told the driver that Spencer's supervisor is on the way. *Id.* at 21:41:36–38. Spencer asked the driver, "could you just turn off the vehicle for right now," and then Spencer says, "could I have the keys?" *Id.* at 21:41:44–46. Spencer said, "just so you know, at this point you are just being detained obviously you are not under arrest or anything like that." *Id.* at 21:41:49–54. Spencer told the driver, "Your eyes are blood shot watery, I can smell alcohol emanating from the vehicle. . ." *Id.* at 21:42:00–03. He informed the driver that he is doing a DUI investigation. *Id.* at 21:42:00–04–06.

Deputy Spencer told plaintiff that if he passes field sobriety tests, he will be free to go. Deputy Spencer further explained that based on the blood shot watery eyes, and talking with plaintiff, he took the car keys for safety. *Id.* at 21:42:06–25. Plaintiff responded, "I'm emotional". *Id.* at 21:42:26–28. Plaintiff stated that "I thought it was legal to park here," and Spencer responded, "at no point did I say it was not legal to

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 4

park here, I just said. . ..” *Id.* at 21:42:28–54. Plaintiff responded, “I don't understand why you're detaining me. Just because I'm parked here?” *Id.* at 21:42:54–59.

Deputy Spencer started to explain about why he was parking behind plaintiff's truck, not blocking the pickup “to where you had an avenue of escape,” and plaintiff responded, “I don't need to escape. I was just sitting here minding my own business” Dkt. 35, Shaeffer Decl. at 1, Ex. 2 at 21:43:01–17.

Deputy Spencer said, “sir, I get it”, and “what I'm telling you is I pulled up behind you, my lights aren't on this isn't a traffic stop,” and plaintiff asked, “so I'm free to leave?” *Id.* at 21:43:19–28. Deputy Spencer responded, “no, not at this point because I'm doing a DUI investigation,” and plaintiff told Deputy Spencer that plaintiff's eyes look that way because he was crying. *Id.* at 21:43:29–44. Deputy Spencer and plaintiff had a conversation. *Id.* at 21:43:23–21:45:29. Deputy Spencer told plaintiff that his partner has arrived, and Spencer reiterated that he is conducting a DUI investigation. *Id.* at 21:45:17–29.

Deputy Spencer walked back to the patrol cars (it appears his partner has arrived in another patrol car, but this person is not identified) and talked with his partner. Deputy Spencer said, “I was going to park here [in the same area where plaintiff had pulled to the side of the road] to run radar.” *Id.* at 21:45:29–45. He told his partner that plaintiff rolled down the window, he observed plaintiff's eyes were blood shot and watery and Deputy Spencer said he could smell a “faint odor of alcohol” coming from the vehicle. *Id.* at 21:46:07–32. Spencer told his partner, “keys were in the ignition” and the car was running before he took the keys from plaintiff. *Id.* at 21:47:19–22. Deputy Spencer then told his partner, “I would assume cooperation.” *Id.* at 21:47:27–30. Deputy Spencer

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 5

talked with his partner about potentially moving to a different location to continue the investigation and he stated that plaintiff told him he was emotional and that's why his eyes are watery. *Id.* at 21:47:50–54.

Deputy Spencer stated, "obviously at this point he's being detained, I mean he's not going to leave, he can just wait there." Dkt. 35, Shaeffer Decl. at 1, Ex. 2 at 21:48:01–29. The other officer walked toward the red pickup, on Deputy Spencer's suggestion, and Deputy Spencer stayed behind, near the police vehicles. *Id.* at 21:48:29 – :51:16.

When the other officer (later identified as Deputy Barbo in his own body camera recording) came back, they discussed whether to do the voluntary field sobriety tests there. *Id.* at 21:58:41. Deputy Spencer walked to the driver's side of plaintiff's truck and asks whether he will voluntarily do the field sobriety tests; and plaintiff declines. *Id.* at 22:01:47 – 22:02:52. Deputy Spencer asked plaintiff to step out of the truck, handcuffs were placed by Deputy Spencer on plaintiff (with hands behind his back), and Deputy Spencer told plaintiff he is "just being detained at this point" and read plaintiff his rights. *Id.* at 22:01:47 – 22:03:59. Deputy Spencer walked with plaintiff to his patrol car, and asked plaintiff to be seated in the back. *Id.* at 22:04:50.

Deputy Spencer and Deputy Barbo opened the door to plaintiff's truck, and Deputy Spencer said he noticed a can in the door. *Id.* at 22:06:00. When Deputy Barbo asked what it is, Deputy Spencer states, "it's a cider." *Id.* at 22:05:44 – 22:06:22. Deputy Spencer stated that it is cider with alcohol; and it appears photographs were being taken of the door. *Id.*  at 22:06:22 – :06:51. Soon after, it appears that another officer arrived but this is somewhat blurry on the video. *Id.* at 22:07:43.

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 6

The plaintiff was transported to the jail, and handcuffs were removed upon arrival. *Id.* at 22:19:26.

The audiovisual evidence shows plaintiff texting on a cell phone. *Id.* at 22:20:32 – :27:40. Mr. Mistachkin stated that his wife will pick him up. *Id.* at 22:27:40. A person who is identified as a Washington State Patrol Trooper arrived and advised plaintiff of the option of taking a breath test. *Id.* at 22:27:22 – 22:28:51. The trooper told Mr. Mistachkin he is under arrest for driving under the influence or actual physical control of a vehicle while under the influence. *Id.* at 22:27:22 – 22:28:51. *Id.*

The audiovisual evidence from Deputy Spencer's body camera shows Mr. Mistachkin at the jail, and he took the breathalyzer test after his attorney arrived. Dkt. 35, Shaeffer Decl. at 1, Ex. 9 at 23:52:33. The State Patrol Trooper gave Mr. Mistachkin and his attorney the results and stated the result is .017. *Id.* at 23:54:31 – :55:06. Deputy Spencer mis–stated the results as .117 in a phone call after he walked back to the patrol car. *Id.* at 23:57:34 – :43.

Deputy Spencer walked back into the jail, and a few moments after midnight on February 13, 2024, he informed Mr. Mistachkin and his attorney that he will be giving him a citation for DUI and being in physical control of the vehicle. *Id.*at 2–13–2024, 0:00:01–:09. Upon being informed that the result was .017, Deputy Spencer stated that his report will be filed and that will be the end of it; then confirmed that Mr. Mistachkin has received his phone, wallet, and car keys. *Id.* at 0:01:09 – 02:19.

- Audiovisual evidence from bodycam of Deputy Barbo

Deputy Barbo's body camera footage shows him arriving at the area where Deputy Spencer is located; Deputy Barbo talked with Deputy Spencer (in this part, the

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 7

audio recording tracks the content described above from Deputy Spencer's body camera, which will not be repeated here). Dkt. 35, Shaeffer Decl. at 1, Ex. 4 at 21:42:28 – :52:08.

Deputy Barbo stated that he wonders if they should "call admin" to "get them in the loop", and Deputy Spencer suggested that before he calls admin, Deputy Barbo should talk with plaintiff to "gauge on your end" so that Deputy Barbo could say that he observed it, too; Barbo then walked to the driver's side of plaintiff's truck. Dkt. 35, Shaeffer Decl. at 1, Ex. 4, at 21:48:21 – 49:25.

After Deputy Barbo introduced himself and talked with Mr. Mistachkin, plaintiff told Deputy Barbo he had pulled over in a safe spot, was kind of emotional, and was having some personal issues at home. *Id.* at 21:49:47– :53. Deputy Barbo told Mr. Mistachkin that he is acting supervisor tonight. *Id.* at 21:50:16. Plaintiff stated that Deputy Spencer had asked for his driver's license, and he gave it to him, but he could not understand why he was being detained because he was not doing anything wrong, just was having a moment. *Id.* at 21:51:02. Plaintiff stated he is fine to drive, but could give his wife a call, and Deputy Barbo responded, "we don't need to call her yet." *Id.* at 21:51:42 – 53:24. Plaintiff also mentioned he has ADHD and gets "amped up." *Id.* at 21:51:51.

Deputy Barbo told plaintiff that he smells alcohol and asks whether he has an open container with an alcoholic beverage or anything in his truck. *Id.* at 21:52:03 – :13. Plaintiff responded that he and his spouse had a drink a couple of hours before while they were in Olympia having dinner. *Id.* at 21:52:12 – :20.

Deputy Barbo walked back to the patrol car and possibly said (the recording is not as loud here) "ya, definitely" to another person who appears to be Deputy Spencer. *Id.* at 21:53:42–:46. Deputy Barbo placed a call and describes the situation to the person receiving the call, and stated that "there is a definite odor of intoxicants coming from within the truck," stated that plaintiff's words were "kind of stumbling"; referred to the start of the events as being a suspicious vehicle; and that Deputy Spencer smelled "booze on the breath" and  "booze inside the truck," and plaintiff had glassy eyes as well. *Id.*  at 21:54:46 –:57:17. The person on the other end of the phone call said, "it is what it is", stated that he is going to call the Sheriff, and suggested that a law enforcement officer from another agency could be contacted to be there observing "if he is giving you a lot of trouble". *Id.* at 21:57:15– :29.

Then Deputy Barbo placed another call, and a law enforcement officer, referred to by the name Elliott (later identified as Officer Elliott Nelson), was requested to join them. *Id.* at 21:57:48 – 22:01:35. Deputy Barbo and Deputy Spencer walked to the driver's side of Mr. Mistachkin's truck and asked whether he will participate in the field sobriety tests. He declines, is handcuffed, and taken to the patrol car. (This portion of the audiovisual has information similar to that described above for Deputy Spencer's body camera recording, but the audio is faint and the visual is blurry and will not be repeated here).

After Officer Elliott arrived, Deputy Barbo described the situation to Officer Elliott. *Id.*  at 22:04:24 – 22:05:16. Deputy Barbo, Deputy Spencer, and Officer Elliott agreed they will transport Mr. Mistachkin to the Sheriff's office and jail to do a breathalyzer test. *Id.*  at 22:07:53 – 22:10:09. There was a suggestion that a trooper should be called to

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 9

help with the BAC, and Deputy Barbo stated that if plaintiff wants to talk with an attorney, they will give him every opportunity. *Id.* at 22:09:29 – :55. Deputy Barbo dictated a note, made calls, and contacted the state patrol "to assist with the BAC process." *Id.* at 22:12:15 – :14:53. The remainder of the audiovisual evidence from Deputy Barbo's body camera will not be recounted, as it documents events that happened after Mr. Mistachkin arrived at the jail and the parties do not contend that what happened at the jail (other than the BAC test result) is relevant to the issues.

## DISCUSSION

### A.  Legal Standards

Summary judgment is supported if the materials in the record "show[] that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure (FRCP) 56 (a),(c). The moving party bears the initial burden to demonstrate the absence of a genuine dispute of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A genuine dispute concerning a material fact is presented when there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In this context, materiality means the fact is "relevant to an element of a claim or defense and whose existence might affect the outcome of the suit"; thus, materiality is "determined by the substantive law governing the claim." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 10

The non-moving party must show that genuine issues of material fact "'can be resolved only by a finder of fact *because they may reasonably be resolved in favor of either party.'" California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson,* 477 U.S. at 250) (emphasis in original). To carry this burden, the moving party is not required to introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir. 2000). A nonmoving party's failure to comply with local rules in opposing a motion for summary judgment does not relieve the moving party of its affirmative duty to demonstrate entitlement to judgment as a matter of law. *Martinez v. Stanford,* 323 F.3d 1178, 1182-83 (9th Cir. 2003).

When the Court considers a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Anderson*, 477 U.S. at 255. Yet the Court is not allowed to perform the jury's function – the Court may not weigh evidence, draw legitimate inferences from facts, or decide credibility. *Id.*

- **Audiovisual evidence**

Factual allegations regarding events that are captured on video, when uncontested, are viewed by the Court "in the light depicted by the videotape." *Scott v. Harris,* 550 U.S. 372, 380-81 (2007); *Spencer v. Pew,* 117 F.4th 1130, 1133 (9th Cir. 2024). If a party's assertion of a fact is obviously contradicted by what is shown in a video recording, a genuine issue of fact does not exist. *Plumhoff v. Rickard,* 572 U.S. 765, 777 (2014); *Williams v. City of Sparks,* 112 F.4th 635, 642 (9th Cir. 2024).

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 11

If the fact is unclear from the video, the Court views the evidence "in the light most favorable to the nonmoving part[ies]." *See Scott*, 550 U.S. at 380; *Hughes v. Rodriguez,* 31 F.4th 1211, 1219-20 (9th Cir. 2022) ("[W]hile we view the facts blatantly contradicted by the bodycam footage in the light depicted by the videotape and its audio to conclude that Hughes did not attempt to surrender to the officers, we must view all other facts, including the allegation of the post-handcuff beating, in the light most favorable to Hughes."); *Vos v. City of Newport Beach,* 892 F.3d 1024, 1028 (9th Cir. 2018) ("The mere existence of video footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage.").

Video evidence "alone [can] raise [ ] material questions of fact about the reasonableness of [officers'] actions and the credibility of [the] post-hoc justification of [their] conduct." *Longoria v. Pinal Cnty.,* 873 F.3d 699, 706 (9th Cir. 2017), cert denied, 138 S.Ct. 2601 (2018). The jury is the appropriate factfinder, not the Court on summary judgment, as to the "probative value of real-time videos and frozen frames." *Id.* at 706 n.5.

If video evidence is subject to different interpretations, the Court cannot decide at summary judgment what the video shows, or what the camera successfully and accurately captured or failed to capture. *Aleman v. City of Charlotte,* 80 F.4th 264, 292-95 (4th Cir. 2023), *cert denied*, 144 S.Ct. 1032 (2024) (finding the trial court erred by giving its own interpretation of the video evidence that was subject to interpretation, not clear in all details, and did not capture everything at the summary judgment stage, when that was a function reserved for the jury); *see* J. Sabatino, *The Appellate Digital Deluge:*

*Addressing Challenges for Appellate Review Posed by the Rising Tide of Video and Audio Recording Evidence,* 96 Temple L. Rev. 11, 33-41, 46-49 (2023) (analyzing probative value of video evidence, and whether such evidence should be reviewed by the trier of fact rather than an appellate court or the Judge on summary judgment at the trial court); D. Barry*, Snap Judgment: Recognizing the Propriety and Pitfalls of Direct Judicial Review of Audiovisual Evidence at Summary Judgment*, 83 Fordham L. Rev. 3343, 3385-86 (2015) (emphasizing that a Judge may be putting themselves in the role of the jury, and when a Judge is viewing audiovisual evidence they may be unaware of reasons why a video does not always speak for itself and uncertain about the scrutiny and legal tools that should be brought to the analysis).

- **Fourth Amendment Standards**

A seizure occurs "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States. v. Mendenhall,* 446 U.S. at 554. The test for a show of authority is objective: whether the officer's acts, and words, would have conveyed to a reasonable person that the person "was being ordered to restrict his movement." *California v. Hodari D.,* 499 U.S. 621, 627-28 (1991).

If officers approach an individual in a car parked in a public place, no Fourth Amendment seizure occurs when the officer identifies himself and poses questions if the person is willing to listen. *United States. v. Washington,* 490 F.3d 765, 770 (9th Cir. 2007). Parking a police vehicle in a manner that does not block a suspect's parked car, getting out of the police car and walking to the suspect's vehicle, is not a seizure. *United States v. Kim,* 25 F.3d 1426, (9th Cir. 1994); *United States. v. Pajari,* 715 F.2d 1378,

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 13

1380-1382 (9th Cir. 1983). But an encounter "may evolve into a situation where the individual's ability to leave dissipates". *United States. v. Ayarza,* 874 F.2d 647, 650 (9th Cir. 1989).

To conduct a lawful pre-arrest investigatory stop, the detaining officer must have a "particularized and objective basis for suspecting the particular person stopped of criminal activity", based on "the whole picture" of the totality of circumstances. *United States v. Cortez,* 449 U.S. 411, 417-18 (1981). The Court must consider "the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen", and to justify the specific intrusion, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio,* 392 U.S. 1, 21 (1968).

The reasonable suspicion standard is less than probable cause or preponderance of the evidence. *United States v. Valdes-Vega,* 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc). When assessing reasonable suspicion, it is permissible for officers to use knowledge and expertise they have developed in their work, to rely on probabilities, and make "commonsense judgments and inferences about human behavior." *Kansas v. Glover,* 589 U.S. 376, 381, 383, 385 (2020). The Court considers the totality of circumstances to review whether reasonable suspicion exists. *Id.* at 386.

Whether police detention of a suspect is an investigatory stop, or an arrest, is a fact-specific inquiry. *Washington v. Lambert,* 98 F.3d 1181, 1185 (9th Cir. 1996). The reviewing Court considers the totality of the circumstances, including "the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 14

liberty was restricted. . . and the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." *Id.* A seizure based on reasonable suspicion is different from a full-blown arrest; to determine whether a person has been arrested, the Court considers "'whether a reasonable person would believe that he or she is being subjected to more than a temporary detention, as well as the justification for the use of such tactics, . . . whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken.'" *United States v. Guerrero,* 47 F.4th 984, 985 (9th Cir. 2022) (quoting *United States v. Brown,* 996 F.3d 998, 1004 (9th Cir. 2021)).

Under *Atwater v. City of Lago Vista,* 532 U.S. 318, 354 (2001), "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." To be a valid warrantless arrest under the Fourth Amendment, the arrest must be based on probable cause to believe the suspect has committed or is committing a crime. *Virginia v. Moore,* 553 U.S. 164, 173 (2008).

To show probable cause existed, the evidence must "prove only that at the moment of arrest the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense." *United States v. McCarty,* 648 F.3d 820, 838 (9th Cir. 2011) (internal quotation marks and citations omitted); *see also, Johnson v. Barr,* 79 F.4th 996, 1003-1004 (9th Cir. 2023) (holding that the existence of probable cause was a jury question; but qualified immunity applied).

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 15

"Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford,* 543 U.S. 146, 152 (2004). "To determine whether an officer had probable cause for an arrest, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause. Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules. It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. Probable cause is not a high bar." *District of Columbia v. Wesby*, 583 U.S. 48, 56-57 (2018) (internal quotations and citations omitted); *see also Miller v. City of Scottsdale*, 88 F.4th 800, 804 (9th Cir. 2023) ("For probable cause, officers may rely on information gained by other officers under the 'collective knowledge' doctrine.").

Probable cause is an objective standard. *Devenpeck*, 543 U.S. at 153; *Whren v. United States,* 517 U.S. 806, 813 (1996). The Ninth Circuit recognized in *Velazquez v. City of Long Beach,* 793 F.3d 1010, 1018 (9th Cir. 2015), that, to determine whether a reasonable jury could have found lack of probable cause, the Court must "look to the asserted crime for which the arrest took place." Information acquired after the police have arrested the suspect is irrelevant to the probable cause inquiry. *Allen v. City of Portland,* 74 F.3d 232, 236 (9th Cir. 1996).

- **State offenses at issue**

Driving while under the influence is a crime under the Revised Code of Washington ("RCW") 46.61.502. As relevant here, Washington law provides that a

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 16

person drives under the influence if they drive while having 0.08 grams or more of alcohol per 200 liters of breath, or if they drive while under the influence of or affected by intoxicating liquor. RCW 46.61.50. Under appellate precedent from Washington State courts, the phrase "under the influence of, or affected by" means "any influence which lessens in any appreciable degree the ability of the accused to handle his automobile." *State v. Hurd,* 5 Wn.2d 308, 316 (1940); *State v. Hansen,* 15 Wn. App. 95, 97 (1976). Proof of erratic driving is not required to convict of driving under the influence. *State v. Gillenwater*, 96 Wash. App. 667, 670 (1999).

Being in physical control of a motor vehicle while under the influence is a lesser offense of driving under the influence, because the elements of these offenses overlap, the only additional element of driving under the influence is that the vehicle is in motion. *State v. Nguyen,* 165 Wn.2d 428, 435-36 (2008). According to RCW 46.61.504(2) and RCW 46.61.503, the defendant may have an affirmative defense if they can show by a preponderance of evidence that, before being pursued by a law enforcement officer, the person has moved the vehicle safely off the roadway. If the evidence supports this defense, the defendant may raise it regardless which party presents the evidence. *State v. Votava,* 149 Wn.2d 178, 183-85 (2003). This affirmative defense applies only to being in physical control; it does not apply to DUI. A vehicle is considered safely off the roadway when the situation no longer poses a threat to the public. *Id.*

Under Washington law an open container violation is a civil traffic infraction under RCW 46.61.519 (2), (3). *State v. Barwick,* 66 Wn. App. 706, 709 (1992); *see also*, RCW 46.63.020 (classifying open container violations as civil infractions). Under some

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 17

circumstances an open container would be evidence of a DUI. *United States v. Grote,* No. CR-08-6057-LRS, 2009 WL 2068023 (E.D. Wash. July 15, 2009).

**B. Analysis**

1. <u>Defendants' Motion for Summary Judgment</u>

The individual defendants assert the affirmative defense of qualified immunity. Dkt. 25 at 21-22.

Grays Harbor County, a municipality, asserts that the plaintiff has not shown any genuine dispute of material fact as to municipal liability for a violation of the Fourth Amendment. Dkt. 25 at 23-27.

Plaintiff argues the individual defendants are not entitled to qualified immunity because there was clearly established law of which a reasonable person would have known, and there are genuine disputes of material fact as to whether each defendant violated plaintiff's Fourth Amendment rights to be free from unreasonable seizure of his person. Dkt. 42 at 2-15.

Plaintiff contends the *Monell* liability issues are not ripe for review on summary judgment because the parties have not completed discovery. *Id*. 16- 23. Plaintiff also argues that the Chief Criminal Deputy Jason Wecker personally participated in the events, and allegations against him are in his individual capacity. *Id*. at 15-16.

- **Initial Contact Did Not Constitute A Seizure**

Plaintiff argues the seizure of Mr. Mistachkin occurred when he was initially questioned by Deputy Spencer, and "[i]t should be plainly obvious to any reasonable law enforcement officer that a car parked lawfully in an atypical spot is not evidence of possible criminal activity." Dkt. 41 at 8.

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 18

Viewing the evidence in the light most favorable to plaintiff, Deputy Spencer observed plaintiff's truck parked in a roadside pullout on Wynooche Valley Road during a rainy evening. Dkt. 26, Spencer Decl., Ex. 1 at 8. Deputy Spencer drove past the truck, returned, parked behind it without activating emergency lights, exited his patrol vehicle, approached the driver's-side window, and shined a flashlight into the vehicle. Dkt. 35, Shaeffer Decl., Ex. 2 at 21:38:19-36.

Spencer introduced himself and explained that he was checking on plaintiff because, "it's just an odd spot for someone to be parking so I was just checking to make sure everything was okay." *Id.* at 21:38:36. Plaintiff responded that he was fine, was just "I'm just taking a moment, for [himself]." *Id.* at 21:39:00. He stated he headed home and lived nearby. *Id.* at 21:38:40. Deputy Spencer then asked where plaintiff lived and requested identification. *Id.* at 21:38:47.

At this stage, no seizure occurred. The patrol vehicle's emergency lights were not activated, Deputy Spencer did not block plaintiff's vehicle, and the encounter consisted of questions regarding plaintiff's welfare and identity. Deputy Spencer specifically stated that plaintiff had an "avenue of escape" and was not blocked in. Dkt. 26, Spencer Decl., Ex. 1 at 8; Dkt. 35, Shaeffer Decl., Ex. 2 at 21:43:01-17. Only when a Fourth Amendment seizure occurs does "the Constitution require some particularized and objective justification." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). As the Supreme Court has explained, "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *INS v. Delgado*, 466 U.S. 210, 216 (1985)(citing *Florida v. Royer*, 460 U.S. 491, 501 (1983)). The Washington Supreme Court has held it is not an unreasonable intrusion for

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 19

an officer to engage in conversation with a driver of a vehicle parked in a public space because "[t]he occupant of a car does not have the same expectation of privacy in a vehicle parked in a public place as he or she might have in a vehicle in a private location." *State v. O'Neill*, 148 Wash. 2d 564, 62 P.3d 489 (2003*). Under clearly established law, an officer's approach to a parked vehicle, asking investigatory questions of an occupant, and request for identification do not, without more, constitute a Fourth Amendment seizure.

Plaintiff urges the Court to "hold as a matter of law that Deputy Spencer seized Mr. Mistachkin when he walked away with his driver's license." Dkt. 54 at 4. For the purpose of defendants' motion, defendants accepted that assertion. Dkt. 53 at 6. Accordingly, for purposes of this motion, the court assumes a seizure occurred when Deputy Spencer walked away with plaintiff's driver's license and analyzes whether Deputy Spencer possessed reasonable suspicion sufficient to justify the detention.

- **Deputy Spencer Had Reasonable Suspicion to Conduct a DUI Investigation**

To conduct a lawful pre-arrest investigatory stop, the detaining officer must have a "particularized and objective basis for suspecting the particular person stopped of criminal activity", based on "the whole picture" of the totality of circumstances. *United States v. Cortez,* 449 U.S. 411, 417-18 (1981). Court's must consider "the 'whole picture,'" including any "commonsense judgments and inferences about human behavior." *Dist. of Columbia v. R.W.*, 146 S. Ct. 1069, 1071-72 (2026) (quoting *Cortez*, 449 U.S at 417*).* "[R]easonable suspicion 'need not rule out the possibility of innocent conduct.'" *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *United States v.*

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 20

*Arvizu, 534 U.S. 266, 277 (2002)*). Viewing the evidence in the light most favorable to plaintiff, before Deputy Spencer walked back to the truck to inform plaintiff that he was being detained for a DUI investigation, he knew the following:

- Plaintiff was seated in the driver's seat of a running vehicle parked alongside the roadway at night in rainy conditions. Dkt. 35, Shaeffer Decl., Ex. 2 at 21:41:44-46; 21:47:19-22.

- Mistachkin had rolled down his window only slightly. Dkt. 26, Spencer Decl., Ex. 2 at 00:39*.*

- Spencer observed that plaintiff's eyes appeared "blood shot, watery." *Id*. at 21:39:57; 21:42:00-03.

- Spencer stated he could smell alcohol emanating from the vehicle. *Id*. at 21:42:00-03.

- Plaintiff stated that he had pulled over to "take a time out" and "take a moment" for himself. *Id*. at 21:38:57-21:39:00.

The evidence shows that before Deputy Spencer walked away with plaintiff's license, he had observed several indicators potentially consistent with impairment. Deputy Spencer told the plaintiff, "Your eyes are blood shot watery, I can smell alcohol emanating from the vehicle. . ." Dkt. 35, Shaeffer Decl. at 1, Ex. 2 at 21:42:00–03. He informed Mistachkin that he was going to conduct a DUI investigation. *Id*. at 21:42:00–04–06. Although plaintiff offered an innocent explanation for his appearance, explaining that he was emotional and had been crying (*Id*. at 21:42:26-28; 21:43:29-44, reasonable

suspicion does not require officers to eliminate innocent explanations before continuing an investigation.

Considering the totality of the circumstances, Deputy Spencer had reasonable suspicion to investigate whether plaintiff was impaired. The combination of bloodshot and watery eyes, the odor of alcohol, plaintiff's presence in the driver's seat of a running vehicle, and the total circumstances of the encounter provided an objectively reasonable basis to conduct a brief DUI investigation. The facts known to Deputy Spencer at the time he retained plaintiff's driver's license were sufficient to establish reasonable suspicion that plaintiff may have been driving or in physical control of a motor vehicle while under the influence.

- **Deputy Spencer and Barbro had Probable Cause**

A traffic stop based on reasonable suspicion is different from a full-blown arrest; to determine whether a person has been arrested, the Court considers "'whether a reasonable person would believe that he or she is being subjected to more than a temporary detention, as well as the justification for the use of such tactics, . . . whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken.'" *United States v. Guerrero,* 47 F.4th at 985.

"An arrest without a search warrant ... [is] valid if the arrest is based on probable cause." *United States v. Bernard*, 623 F.2d 551, 558–59 (9th Cir. 1979). Probable cause requires that "at the moment of arrest the facts and circumstances within the knowledge of the arresting officers 'and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" *Id.* at 559 (quoting *Beck v. Ohio*, 379 U.S. 89, 91(1964)). In

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 22

applying the *Beck* standard, the reviewing court "must consider all the facts known to the officers ... before the arrest." *United States v. Martin*, 509 F.2d 1211, 1213 (9th Cir. 1975). This is a totality of the circumstances test. *United States v. Cortez*, 449 U.S. 411, 417 (1981). The determination of whether probable cause existed is an issue of fact to be analyzed separately given each case's unique set of facts. *Martin*, 509 F.2d at 1213.

For the purposes of defendants' motion, plaintiff was arrested when he was ordered out of the vehicle and handcuffed. Dkt. 53 at 2.

To determine whether a reasonable jury could have found lack of probable cause, the Court must "look to the asserted crime for which the arrest took place." *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1018 (9th Cir. 2015). The relevant question is, viewing the evidence in the light most favorable to the plaintiff, is not whether plaintiff ultimately violated RCW 46.61.502 or RCW 46.61.504, but whether the facts known to Deputies Spencer and Barbo at the time plaintiff was handcuffed were sufficient to warrant a prudent officer in believing that plaintiff had driven, or was in actual physical control of, a motor vehicle while under the influence of alcohol. *Bernard*, 623 F.2d 551 at 559. In Washington courts, "under the influence of, or affected by" means "any influence which lessens in any appreciable degree the ability of the accused to handle his automobile." *State v. Hurd,* 5 Wn.2d 308, 316 (1940); *State v. Hansen,* 15 Wn. App. 95, 97 (1976).

Viewing the evidence in plaintiff's favor, the following facts were known to Deputies Spencer and Barbo before plaintiff was handcuffed:

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 23

- Plaintiff was seated in the driver's seat of a vehicle parked alongside the roadway with the engine running and keys in the ignition at night in rainy conditions. Dkt. 35, Shaeffer Decl., Ex. 2 at 21:47:19-22.

- Deputy Spencer observed plaintiff's eyes to be bloodshot and watery. *Id*. at 21:39:57; 21:42:00-03.

- Deputy Spencer reported smelling alcohol emanating from the vehicle and later described a faint odor of alcohol. *Id*. at 21:42:00-03; 21:46:07-32.

- Deputy Barbo independently reported smelling alcohol and later described a "definite odor of intoxicants coming from within the truck." Dkt. 35, Shaeffer Decl., Ex. 4 at 21:52:03-13; 21:54:46-57:17. He stated that plaintiff had glassy eyes as well. *Id.* at 21:54:46 –:57:17.

- Plaintiff admitted that he and his spouse had consumed alcohol a few hours earlier while at dinner in Olympia. *Id.* at 21:52:12-20.

- Plaintiff offered to call his wife and stated she could drive. *Id*. at 21:51:42-53:24.

- Plaintiff declined to participate in field sobriety testing after Deputy Spencer told plaintiff that if he passes field sobriety tests, he will be free to go. Dkt. 35, Shaeffer Decl. at 1, Ex. 2 at 21:42:06–25; Dkt. 35, Shaeffer Decl., Ex. 2 at 22:01:47-22:02:52.

Although Deputy Barbo described plaintiff's words as "kind of stumbling," the Court's review of the recordings does not either confirm or reject the assertion of stumbling speech, and the Court therefore does not rely on that characterization. Dkt. 35, Shaeffer Decl., Ex. 4 at 21:54:46-57:17. The record also does not establish when or

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 24

if the deputies became aware of any discrepancy between the address plaintiff verbally provided and the address listed on his driver's license. Dkt. 53 at 14-15. Accordingly, the Court does not consider those circumstances in evaluating probable cause. The Court confines its analysis to facts that were undisputedly known to the deputies before plaintiff was handcuffed.

Washington courts have recognized that indicators such as the odor of alcohol, blood shot or water eyes, admission of alcohol consumption, and other manifestations of impairment may collectively establish probable cause for a DUI arrest. The Ninth Circuit has also relied on these facts. *See Williams v. Seals*, No. 18-15059, 2020 WL 1066051, at *511 (9th Cir. Mar. 5, 2020) (holding probable cause existed when plaintiff refused to take a field sobriety test and was arrested on suspicion DUI, noting that "the Officers' statements also contained details about [defendant's] appearance, including his bloodshot eyes, and their perception that he smelled of alcohol.")

In *State v. Martines*, the Washington Supreme Court held officers had probable cause to believe a DUI suspect was under the influence of intoxicants where the (1) defendant smelled of alcohol, (2) admitted to drinking one beer, (3) hid empty beer bottles, (4) had bloodshot, watery eyes, (5) a flushed face, and (6) walked in a slow, off-balance manner. 184 Wash.2d 83, 91-92 (2015). The odor of alcohol on a person's breath or person is a recognized indicator supporting further investigation, as are watery or bloodshot eyes. *State v. Cerrillo*, 122 Wash. App. 341, 351-52 (2004) (holding a "reasonable person would agree with [officer] that the smell of alcohol emanating from [defendant] during the first encounter indicated that [defendant] likely was under the influence of alcohol); *State v. Griffith*, 61 Wash. App. 35, 38-39 (1991)(after witnessing

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 25

erratic driving and conducting sobriety tests, officer also observed watery, bloodshot eyes, slurred speech, and a strong odor of intoxicants.). Although bloodshot or watery eyes may have innocent explanations and some authorities have questioned their reliability as standalone indicators of impairment, Washington courts continue to consider them among the facts relevant to the probable-cause analysis. *Id.*; *but see*, NHTSA, *The Detection of DWI at BACs Below 0.10*, September 1997, DOT HS 808 654 (NHTSA eliminated bloodshot eyes and a flushed face as possible objective indicia of alcohol impairment because such factors are subjective and correlate more with factors other than alcohol consumption.)).

At the same time, Washington law requires there must be more than simply the odor of alcohol and driving for the officer to have probable cause to arrest for DUI. In *State v. Gillenwater*, the Court of Appeals concluded probable cause existed to arrest in a fatal accident that was not the suspect's fault where the driver smelled of beer, had a cooler containing beer, and three opened beer cans were found in the vehicle, and "most importantly, the paramedic report a strong odor of alcohol" on the driver, even though officers did not administer field sobriety tests and the driver did not exhibit slurred speech or bloodshot eyes and a witness told officers the suspect had been travelling at the speed limit and was not driving erratically. *State v. Gillenwater*, 96 Wash. App. 667, 670-71 (1999). The court explained that, while those facts did not establish guilt beyond a reasonable doubt, they provided a sufficient basis to warrant a cautious person in believing the offense had been committed. *Id.* at 671. Thus, there

must be some combination of facts beyond the mere odor of alcohol and operation of a vehicle to establish probable cause for a DUI arrest.

Similar principles apply to the offense of being in actual physical control of a motor vehicle while under the influence. Probable cause may exist where a driver appears to be intoxicated because there is a smell of alcohol in the vehicle, as well as on defendant's breath, and is seated in the driver's seat of a vehicle with the engine running. *State v. Reid*, 98 Wash. App. 152, 160 (1999)(holding officer could arrest defendant without a warrant because he had probable cause; defendant was asleep on the side of a car that had its engine running, parked three feet off the roadway on the shoulder of a highway, refused a sobriety test, and officer had to turn off the ignition).; *City of Spokane v. Badeaux*, 20 Wash. App. 731, 734 (1978)( defendant's "intoxication, coupled with the running engine of his automobile, provided the officer with probable cause to believe that [defendant] was in actual physical control of a vehicle while under the influence of intoxicating liquor.").

Plaintiff argues that innocent explanation existed for some of these observations, including that his eyes appeared watery because had been emotional and that his last drink had been at dinner two hours ago. However, probable cause does not require officers to rule out innocent explanations before making an arrest. *Dist. of Columbia v. R.W.*, 146 S. Ct. 1069, 1072-73 (2026). The relevant inquiry is whether the facts known to the officers would warrant a reasonable belief that an offense had occurred – the Court must evaluate the totality of the circumstances rather than viewing each fact in isolation.

Considering the totality of the circumstances known to Deputies Spencer and

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 27

Barbo at the time of arrest, the officer had probable cause to arrest Mistachkin. Even accepting plaintiff's explanation for some of the observed indicators, the combination of the odor of alcohol, bloodshot and watery eyes, admission of alcohol consumption, operation or actual physical control of a running vehicle, and refusal to perform field sobriety testing provided sufficient facts to warrant a prudent officer in believing that plaintiff had been driving or was in actual physical control of a vehicle while under the influence of alcohol. *See United States v. Tyndal*, 172 F. App'x 741, 742 (9th Cir. 2006) (holding police officers had probable cause to arrest defendant who was detained initially in a *Terry* stop and admitted he had driven into the parking and had his license suspended once he refused to perform field sobriety tests.).

Accordingly, defendants are entitled to summary judgment on plaintiff's claim that he was arrested without probable cause.

- **Qualified Immunity as to Individual Defendants**

Unless plaintiff makes a two-part showing, qualified immunity shields government officials from liability. The plaintiff must show both: the official(s) violated a federal statutory or constitutional right, and — at the time of the alleged act or failure to act there was clearly established law that defined the contours of the federal right objectively putting the official(s) on notice – i.e., every reasonable official would understand that what they are doing is unlawful. *District of Columbia v. Wesby,* 138 S.Ct. 577, 589 (2018). Qualified immunity is an immunity from suit, and immunity

questions should be resolved at the earliest possible stage. *Cmty. House, Inc. v. City of Boise, Idaho,* 623 F.3d 945, 964 (9th Cir. 2010).

When qualified immunity is reviewed in the context of a defense motion for summary judgment, the evidence must be considered in the light most favorable to the plaintiff with respect to central facts. *Tolan v. Cotton,* 572 U.S. 650, 657 (2014) (per curiam). "[S]ummary judgment based on qualified immunity should be denied if under the plaintiff's version of the facts the officer could not reasonably believe his conduct was lawful." *Knox v. Southwest Airlines,* 124 F.3d 1103, 1108 (9th Cir. 1997).

Here, there was no violation of a federal statutory or constitutional right, and qualified immunity shields the officers from immunity.

- **Chief Criminal Deputy Wecker is Entitled to Qualified Immunity**

Plaintiff argues defendants rely on the wrong legal standard in seeking dismissal of Chief Wecker. Plaintiff argues Chief Wecker's liability does not arise under supervisory liability, but under the Ninth Circuit's "integral participant" doctrine. Dkt. 49 at 11 ("Mr. Mistachkin has not argued that Chief Wecker is liable under the rubric of *Monell* supervisory liability, which was at issue in *Olson v. County of Grant. Olson,* 127 F.4th 1193, 1197 (9th Cir. 2025). Instead, Mr. Mistachkin argues that Chief Wecker is individually liable for Mr. Mistachkin's unlawful seizure.").

Under the "integral participant" doctrine, section 1983 liability extends to those who perform functions "integral" to an alleged violation, even if their individual actions do not themselves rise to the level of a constitutional violation. *See Bravo v. City of Santa Maria*, 665 F.3d 1076 (9th Cir. 2011) (agents of a sheriff's office that did not search a particular home were deemed not to be integral participants in the

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 29

unreasonable search of the home by other law enforcement officers). Ninth Circuit precedent has permitted liability in situations where: "(1) the defendant knew about and acquiesced in the constitutionally defective conduct as part of a common plan with those whose conduct constituted the violation, or (2) the defendant set in motion a series of acts by others which the defendant knew or reasonably should have known would cause others to inflict the constitutional injury." *Peck v. Montoya*, 51 F.4th 877, 891 (9th Cir. 2022). The doctrine does not implicate officers that are "mere bystanders." *Id*. at 889.

In *Torres v. City of Los Angeles*, 548 F.3d 1197 (9th Cir. 2008), the Court found no evidence of integral participation where there was no evidence a detective instructed other detectives to arrest plaintiff or evidence other law enforcement officers consulted with the detective before making the arrest. By contrast, in *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004), officers who participated in the search of an occupied dwelling where other officers deployed a flash-bang device without warning were integral participants because they were aware of the decision to use the device, did not object to it, and participated in the operation knowing about the plan. Similarly, in *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 941-42 (9th Cir. 2020), a case that involved an arrest that was unlawfully conducted without probable cause, the Court held that an officer who had ordered plaintiff be "picked up" was an integral participant in the unlawful arrest because the officer's order caused the arrest, and the officer knew the order would cause an unlawful arrest because the officer had no basis for believing there was probable cause. And in *Nicholson v. City of Los Angeles*, 935 F.3d 685, 692 (9th Cir. 2019), the Court held an officer liable as an integral participant in an unlawfully

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 30

prolonged detention because he was the initial officer who set the events in motion and either instructed the arrest of plaintiffs or consulted officers regarding the decision to arrest.

Plaintiff contends that Chief Wecker was an integral participant in the alleged unlawful seizure because he was informed of the deputies' intent to arrest plaintiff and "gave the deputies approval to continue their DUI investigation and to place Judge Mistachkin under arrest if they saw it fit to do so." Dkt. 14, Amended Complaint at 5; Dkt. 41 at 16 (citing Dkt. 32 at 4:6–5:12). According to plaintiff, Chief Wecker effectively authorized the arrest when he responded "it is what it is" after learning the deputies intended to arrest plaintiff if he refused to submit to field sobriety testing. Dkt. 49 at 11 (citing Dkt. 35-5 at 7 (20:20–25)). Plaintiff further contends that the deputies' decision to consult Chief Wecker before making the arrest supports a finding that he participated in the decision-making process and thereby played an integral role in the seizure. *Id*.

Defendants argue the "integral participant" doctrine claim is inapplicable because Deputies Spencer and Barbo are entitled to qualified immunity, and cases cited by plaintiff "do not establish 'beyond debate' that a supervisor located miles away from a roadside investigation becomes liable merely by receiving a phone call advising that on-scene officers intend to investigate a suspected DUI." Dkt. 49 at 11. Defendants emphasize that Chief Wecker was not on the scene and cite to his declaration stating that he "was not present during any of the interactions" and that he later learned plaintiff had been taken into custody only by text message. *Id*. (citing Dkt. 28 ¶¶ 2–3).

According to defendants, plaintiff offers no evidence contradicting this declaration, and the video confirms that when Deputy Barbo spoke with Chief Wecker,

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 31

he reported that plaintiff was "being detained," "not under arrest at this point," and that the deputies intended to "go through it like a normal DUI." Dkt. 49 at 11 (citing Dkt. 35-5 at 7 (20:20–25)).

The audiovisual evidence reflects that after arriving on scene Deputy Barbo contacted Chief Wecker and stated they "found a suspicious vehicle," that "inside the vehicle is Judge Mistachkin," that "the truck was running," and that Mistachkin "appears to be under the influence" and was "a bit argumentative." Deputy Barbo further relayed that plaintiff claimed he had been crying, which he said explained his red and watery eyes, but that there was a "definite odor of intoxicants" coming from the vehicle and that plaintiff had admitted to having a drink with his wife about two hours earlier. In response, Chief Wecker stated, "it is what it is," and that he would advise Sheriff Darrin Wallace about the situation. He also suggested that Deputies Barbo and Spencer call another agency if plaintiff remained argumentative. *See* Dkt. 27, Deputy Jeff Barbo, Ex. 2 at 15:37–16:02. Deputy Barbo subsequently requested that dispatch send a Montesano police officer, Officer Elliot Nelson, to assist. *Id*. at 17:17–19:21.

As discussed above, the Court views the evidence "in the light depicted by the videotape", because this is uncontested audiovisual evidence. *Scott v. Harris,* 550 U.S. 372, 380-81 (2007); *Spencer v. Pew,* 117 F.4th 1130, 1133 (9th Cir. 2024).

The evidence shows that Chief Wecker's brief conversation with Deputy Barbo Chief Wecker did not convey to Deputy Barbo any assessment or opinion about whether there was, or was not, reasonable suspicion or probable cause at a given point in time. He did not direct Deputy Barbo to act or refrain from acting in any particular way; Chief Wecker is therefore not an integral participant. There are no genuine

disputes of material fact that a jury should decide, and no clearly established law in existence at the time that would have alerted Chief Wecker that his conversation with Deputy Barbo would be such that "every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011). Chief Wecker is entitled to qualified immunity because he did not direct or encourage the other officers to detain or arrest plaintiff. Under *Torres v. City of Los Angeles*, 548 F.3d 1197 (9th Cir. 2008), qualified immunity applies, and the claims against Chief Wecker are dismissed.

- **Municipal Liability of Grays Harbor County**

Defendants argue that defendant Grays Harbor County should be dismissed because there is allegedly insufficient evidence of ratification by final policymakers or any deliberately indifferent custom and practice so widespread to constitute policy under *Monell v. Dep't of Soc. & Health Services,* 436 U.S. 658 (1978). Dkt. 41 at 17. Because there was no constitutional violation, municipal liability does not attach. The Court grants defendant's motion for summary judgment on municipal liability.

## CONCLUSION

For these reasons, Defendants' motion for summary judgment GRANTED. Plaintiff's motion for partial summary judgment is DENIED.

Dated this 13th day of July, 2026

Theresa L. Fricke
United States Magistrate Judge

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT - 33